UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CIVIL ACTION NO. 5:11-49-KKC

JOSEPH H. CRAMER,

PLAINTIFF

v.        **MEMORANDUM OPINION AND ORDER**

APPALACHIAN REGIONAL HEALTHCARE, INC., et. al.,

DEFENDANTS

\* \* \*   \* \* \*   \* \* \*

This matter is before the Court on the parties' briefs addressing the top hat plan status of the Appalachian Regional Healthcare Supplemental Executive Retirement Program. Pursuant to this Court's Scheduling Order (DE 21), the parties submitted briefs on this threshold issue. Having reviewed the briefs, the record, and being otherwise sufficiently advised, the Court concludes that the plan at issue is a top hat plan as defined by 28 U.S.C. § 1051(2).

**I.   BACKGROUND**

This dispute arises from a denial of benefits under a supplemental pension plan. Plaintiff was employed by Defendant, Appalachian Regional Healthcare ("ARH"), from 1981 until 2008. In 1994, Cramer was promoted and became eligible for ARH's Supplemental Executive Retirement Plan ("SERP"), which was created in 1986. The 1986 SERP defined years of service to include all years in which the participant was employed at ARH. Cramer retired/resigned from ARH in 2007 at age 49, and under the 1986 SERP's years of service calculation, was entitled to receive a monthly benefit of $1,009.34.

1

On December 31, 2008, ARH adopted an Amendment and Restatement of the SERP ("2008 SERP"). The 2008 SERP changed the years of service definition to include only the years an employee was eligible for SERP, not the years an employee was employed by ARH but ineligible for SERP. Under the 2008 SERP, Cramer would not receive any SERP benefits. Cramer and ARH dispute whether his benefits are determined by the 1986 or 2008 SERP.

On November 20, 2010, after an administrative review, the SERP Committee denied Cramer's appeal and held that the 2008 SERP governed his benefits. On January 28, 2011, Cramer filed the instant action bringing four causes of action: (1) a claim for Employee Retirement Income Security Act (ERISA) benefits pursuant to ERISA § 502(a)(1)(B); (2) violations of ERISA's vesting and anti-kickback requirements pursuant to ERISA § 502(a)(3); (3) breach of fiduciary duty pursuant to ERISA § 502(a)(2); and (4) equitable estoppel.

**II.     ANALYSIS**

In this case, whether the ARH's Supplemental Executive Retirement Plan ("SERP") qualifies as a top hat plan is a threshold issue. Top hat plans are not subject to ERISA §§ 502(a)(2) and (3). *Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007). A top hat plan is a term used to identify a plan described in 29 U.S.C. § 1051(a)(2) that is "unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." Congress exempted top hat plans from many ERISA provisions because top hat plan beneficiaries do not need the protection of ERISA "by virtue of their positions or compensation levels." *Bakri*, 473 F.3d at 678. As the parties asserting the exemption, the Defendants carry the burden for proving that the plan qualifies for the top hat exemption. *Daft v. Advest*, 658 F.3d 583, 596-97 (6th Cir. 2011).

2

There is no dispute that the SERP is an unfunded plan. The dispute, therefore, is whether the SERP is maintained by ARH "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(a)(2). There are four factors used to determine if a plan qualifies as a top hat plan: (1) the percentage of the total workforce invited to join the plan; (2) the nature of their employment duties; (3) the compensation disparity between top hat plan members and non-members; and (4) the actual language of the plan agreement. *Bakri*, 473 F.3d at 678. In the Memorandum Opinion and Order (DE 17), this Court allowed limited discovery to determine these factors. Application of the four factors set out in *Bakri* establishes that the ARH's SERP is a top hat plan.

**1.   Percentage of the Total Workforce Invited to Join the Plan**

The first factor analyzes the size of the plan relative to the total workforce, because top hat plans must be quantitatively "select." "While plans offered to a very small percentage of an employer's workforce often qualify as top hat plans … there is no existing authority that establishes when a plan is too large to be deemed 'select.'" *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 288 (2d Cir. 2000) (gathering cases). "Although there is no bright-line rule on what constitutes a 'select group of management of highly compensated employees,' plans that limit participation to 15% or less of the workforce have consistently been treated as top hat plans." *Callan v. Merrill Lynch & Co., Inc.*, No. 09-CV-0566 BEN (BGS) 2010 WL 3452371, at *10 (S.D. Cal. Aug. 30, 2010) (citations omitted).

In response to the Plaintiff's discovery request, the Defendants provided documentation and information concerning the SERP enrollment in 2007 and 2008. In 2007, ARH had 23 SERP-eligible employees compared to 5,396 non-eligible employees. (*See* DE 24-2, Answers to Plaintiff's Second Set of Interrogatories and Requests for Production of Documents and

3

attachments ARH001-ARH010).  In 2008, ARH had 21 SERP-eligible employees compared to 5,071 non-eligible employees.  (*Id.*)  For these two years, 2007 and 2008, 0.4% of ARH employees were members of the SERP.  Additionally, the administrative record contains information relevant to this factor.  In 2002, there were 25 active SERP-eligible members (AR 0265), while in 2003 and 2004, there were 21 active SERP members.  (ARH 0065).  The small number of SERP participants indicates that the group indeed is a "select group" at ARH, and so this factor weighs in the Defendants' favor.

### 2. Nature of Plan Members' Employment Duties

Top hat participants should be "high-ranking management personnel" who "are therefore better equipped than ordinary pension plan participants to effectively protect their interests." *Spacek v. Maritime Ass'n,* 134 F.3d 283, 289, 297 n. 12 (5th Cir. 1998).

Under this plan, membership was reserved for ARH's "Corporate Executive Staff … on Payroll Group I."  (ARH 0357, 1986 SERP at § 3.01).  Cramer acknowledges that he joined the SERP after being promoted to an executive position within Payroll Group I.  (DE 1, Complaint at ¶ 13).  Cramer argues that a few members of the SERP fail to meet the standard of "high-ranking management personnel," thus disqualifying the entire plan.   In support, Cramer provides the affidavit of Paula Eden, who worked at ARH from 1990 until 2007.  (DE 25-3, Eden Aff. ¶ 2).  During her tenure with ARH, Eden worked as the pension coordinator from 1990 until 1995, was promoted to Employee Relations Manager, and then served as Corporate Director of Human Resources for Compensation and Benefits from 1995 until December of 2007.  (*Id.* at ¶ 3).   In these roles, Eden managed and administered salary and benefits, including the SERP.  (*Id.* at ¶ 4).  Based on this experience, Eden states that between 1990 and 2007 "there were many ARH employees who were members of Payroll Group I and participated in the SERP, but they did not

4

exercise or have the authority or control generally associated with management and executive employees[.]" (*Id.* at ¶ 11). According to Eden, there were 11 such individuals, and she identifies each of them. (*Id.* at ¶ 12). For each, Eden provides the job title and a brief overview of that job's duties. (*Id.* at ¶¶ 13-27). For example, in her affidavit, Eden explains that "Gary Smock served as a recruiter for ARH. His duties consisted of recruiting physicians to staff ARH's hospitals." (DE 25-2, Eden Aff. ¶ 24). Eden's affidavit does not include compensation levels, individual salaries, employment dates, or more information beyond these statements. More information is provided, however, for one employee, Carolyn Solomon. (*Id.* at ¶¶ 13-17). According to Eden, Solomon participated in the SERP from 1991 to 1994, while in Payroll Group I, when Solomon was employed as Assistant to ARH's President. (*Id.*) Eden notes that Solomon left the SERP at the time when her position changed and her membership in Payroll Group I ended. (*Id.*) Eden claims that "[o]cassionally SERP members would be removed from executive positions and allowed to work on special projects or various tasks assigned by the ARH President," but that "despite the change in their duties and position, these employees were invariably allowed to remain in the SERP." (*Id.* at ¶ 17).

In *Demery*, however, the Second Circuit refused to focus on a few members when determining top hat status. 216 F.3d at 289. Instead, the court in *Demery* found the plan was maintained primarily for the designated purpose of providing deferred compensation for a select group of management. "Therefore," the Second Circuit explained, "we do not find plaintiffs' focus on the two or three employees who were arguably not 'highly compensated' or 'a select group of management' to be dispositive." *Id.* Similarly, in *Fishman v. Zurich American Insurance Co.*, the court found that raising eligibility concerns about a few plan participants "does not does not deprive the Plan of top-hat status, because their involvement fits the stated

5

purpose of the Plan (and the statute)." 539 F. Supp. 2d 1036, 1044 (N.D. Ill. 2008). The applicable statue, 29 U.S.C. § 1051(2), declares that a plan must be maintained "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." Accordingly, "if a very few non-management or non-highly-compensated employees are allowed to participate in a plan, it still qualifies under the statutory definition, for it is still maintained *primarily* for the designated purpose." *Fishman*, 539 F. Supp. 2d at 1043. Likewise, the SERP in this case is maintained primarily for the designated purpose required of a top hat plan, because top-level management and highly-compensated employees predominate in the SERP.[1] Therefore, unlike a plan rejected by the Sixth Circuit in *Bakri*, the SERP in this case exhibits the selectivity required of a top hat plan.

Eden also claims that "it was clear to [her] that the vast majority of SERP participants did not have sufficient influence to effectively negotiate with ARH directly regarding their pension and deferred compensation benefits." (DE 25-2, Eden Aff. ¶ 29). Eden does not offer support for this opinion. While the Sixth Circuit did not list the bargaining power of plan participants as a quantitative or qualitative factor for top hat analysis, it noted that §"test" of a "select group" is its ability to negotiate directly with its employer. *Bakri*, 473 F.3d at 678-79 (quoting *Carrabba v. Randalls Food Markets, Inc.,* 38 F. Supp. 2d 468, 477 (N.D. Tex. 1999)). In this case, the bargaining power required is not clear.

---

[1] According to the Third Circuit, "the test requires satisfaction of either the 'management' or 'highly compensated' employees standard," so on the basis of the SERP members' high compensation, they already qualify as high level employees. *In re IT Group, Inc.*, 305 B.R. 402, 411 (Bankr. D. Del. 2004) *aff'd*, 323 B.R. 578 (D. Del. 2005) *aff'd,* 448 F.3d 661 (3d Cir. 2006),

6

Considering ERISA's statutory language, the First Circuit has rejected the notion that top hat plan status requires members possess individual bargaining power. *Alexander v. Brigham & Women's Physicians Org., Inc.*, 513 F.3d 37, 47 (1st Cir. 2008). Specifically, the First Circuit addressed the impact of the Department of Labor's opinion letter No. 90-14A, which Cramer cites in support of his position. In that letter, the Department of Labor examines the purpose behind top hat plans' special status. "The purpose of the 'top hat' exception to ERISA coverage has been characterized by the Department of Labor as a recognition by Congress 'that certain individuals, by virtue of their positions or compensation level, have the ability to affect or substantially influence, through negotiations or otherwise, the design and operation of their deferred compensation plan ... and would, therefore, not need the substantive rights and protections of' ERISA." *Bakri,* 473 F.3d at 678 (citing DOL, Office of Pension & Welfare Benefit Programs, Opinion 90–14A, 1990 WL 123933 at *1 (May 8, 1990)). The First Circuit emphasizes that this analysis speaks to the purpose of the exception and does not add an additional requirement for the classification of top hat plans. *Alexander*, 513 F.3d at 47. Requiring each plan member to possess individual bargaining power, the First Circuit concludes, would create "bizarre consequences," namely that "every top-hat plan [could] be rendered noncompliant by demonstrating that a single covered employee lacks individual bargaining power, no matter the overall characteristics of the 'select group of management or highly compensated employees' to which he belongs." *Id.* at 47-48. Instead, the First Circuit agreed with other courts which "recognize the sensible proposition that it is the configuration of the group as a whole that controls." *Id.* at 48 (citing *Demery,* 216 F. 3d at 289; *Guiragoss v. Khoury,* 444 F. Supp. 2d 649, 663–64 (E.D. Va. 2006); *Belka v. Rowe Furniture Corp.,* 571 F. Supp. 1249, 1252–53 (D. Md. 1983)). Here, the SERP's overall composition is that of a select group;

7

its members come from the Corporate Executive Staff, and overall, they possess the requisite authority needed for top hat plan status.

### 3. Compensation Disparity Between Top Hat Plan Members and Non-Members

Qualification as a top hat plan also requires a significant disparity between the average compensation of the top hat group and the average compensation of all other employees. *Simpson v. Ernst & Young*, 879 F. Supp. 802, 816 (S.D. Ohio 1994) *aff'd*, 100 F.3d 436 (6th Cir. 1996).

In this case, ARH has provided the average annual compensation, as reported on W-2 forms for 2007 and 2008, for SERP members and all other employees. There is a clear disparity in this compensation. In 2007, the non-SERP members' average compensation was $32,157.26. In contrast, the SERP members' average compensation was $148,178.81, more than four and half times of those outside the plan. In 2008, non-SERP employees' average compensation was $35,620.44, while the SERP members' average compensation was $189,878.95, more than five times greater than that of ARH's non-member employees. The disparity illustrates that the members of the SERP are "highly compensated." Courts have considered similar ratios were sufficient to qualify plans for top hat status. In *Alexander*, the First Circuit concluded that when contributors to a plan received more than five times the average income of non-plan employees, the contributors "were highly compensated in both relative and absolute terms." 513 F.3d 37, 46 (1st Cir. 2008). Similarly, in *Callan*, a court applied the *Bakri* factors and found that a 2:1 ratio between participant and non-participant salaries was enough to satisfy this factor. 2010 WL 3452371, at *11.

Cramer argues that the more appropriate comparison for this factor is between the lowest-paid SERP member's salary and the average non-SERP member's salary. *See Carrabba,* 38 F.

8

Supp. 2d at 477 ("Rather than the average salary, the range of salaries is more useful."). In 2007, the lowest SERP member salary was $83,503, while in 2008, that number was $86,008. While this comparison presents a less substantial disparity, the SERP member's salary is still more than two times greater than the average non-member's salary. Given that "courts have found that a 2:1 disparity is sufficient to satisfy this prong of the test," even this disparity supports the SERP's top hat plan status factor. *Callan,* 2010 WL 3452371, at *11. Therefore, this factor also weighs in ARH's favor.

4. **Actual Language of the Plan Agreement**

The 1986 SERP and the 2008 SERP identify the purpose of the SERP as being to enable ARH "to recruit management employees and retain the services of and provide rewards and incentives to members of a select group of management employees who contribute to the success of [ARH]." (AR 0352, 0421). In pursuit of that goal, Section 3.01 of the 1986 SERP and Section 3.1 of the 2008 SERP provide, respectively, that "[e]ligibility for membership in this Plan shall be members of the employer's Corporate Executive Staff who are on Payroll Group I" and "[o]nly Eligible Employees, all of whom are 'key management or highly compensated employees' within the meaning given the phrase in ERISA, shall be eligible to participate in the Plan." (AR 0357 and 0427). "A plan, however, cannot merely state it complies with ERISA's top hat exemptions in order to qualify thereunder." *Callan*, 2010 WL 3452371, at *12. In other words, "merely inserting the ERISA definition of a top hat plan into a document is insufficient if the actual plan does not satisfy the top hat requirements." *Guiragoss*, 444 F. Supp. 2d at 658. Instead, the plan's management and administration control the analysis.

In this case, ARH worked with William M. Mercer, a benefits and compensation consulting firm, concerning SERP's status in 1986 and again 1992. As a result of those

9

consultations, ARH registered the SERP as a top hat plan with the Department of Labor.  In 1992, Mercer advised ARH to remove 19 of the 53 employees participating in SERP to ensure qualification as a top hat plan.  No employees were removed based on this advice, according to the affidavit submitted by former ARH employee Eden.  (Eden Aff. ¶ 32).  Eden, however, does acknowledge that one employee, Solomon, was removed from the SERP in 1994 when Solomon no longer held the position of Assistant to the President and was no longer a member of Payroll Group I.  In addition, an e-mail from Eden confirms that whenever an employee was reclassified from Payroll Group I to another payroll group, the employee was removed from the SERP. (DE 24-4, E-mail from Paul Eden to Dan Fiztpatrick, Aug. 22, 2006).  In the e-mail, Eden also explains that "Mr. Johnson [then ARH president] only removed a few members as they went from Group I to another payroll group," and that Steve Hanson (when he was ARH president) "decided to downsize the SERP through attrition and/or when a member went from Group I to another payroll group."  (DE , Exh. 3 August 22, 2006).  These statements show that ARH maintained the limits of the SERP.  ARH administered and interpreted the SERP for the select group defined as Corporate Executive Staff and Payroll Group I.

Cramer also argues that ARH's interpretation of the SERP reveals the plan provides no effective bargaining power for members and instead offers only illusory promises of benefits. Specifically, Cramer points to the section of the 1986 SERP which ARH claims allows it to amend the plan retroactively to reduce or eliminate benefits before a plan member reaches age 65. Cramer argues that this provision strips the plan members of necessary protections, because top hat plans "were exempted [from ERISA] on the premise that the employer's top-level executives have sufficient influence within the institution to negotiate arrangements that protect against the diminution of their expected pensions." *Gallione v. Flaherty*, 70 F.3d 724, 728 (2d

Cir. 1995). On balance, this factor still favors the Defendants. The plan's actual language and administration evidence top hat status.

### III. CONCLUSION

Overall, the quantitative and qualitative factors show the SERP to be a top hat plan as defined by 29 U.S.C. § 1051(2). The plan was created and administered for a small, select group of highly compensated and management employees at ARH. As a result, the SERP is a top hat plan. For the above stated reasons, the Court determines SERP is a top hat plan.

Dated this 29th day of October, 2012.

Signed By:
*Karen K. Caldwell* KKC
United States District Judge